Filed 5/31/24  P. v. Hernandez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D082241 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1401079) |
| RAYMOND HERNANDEZ, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Johnson, Judge.  Motion to strike granted.  Affirmed in part and remanded for sentencing.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Raymond Hernandez admitted he fatally shot his cousin, Manuel Hernandez, Jr., known in the family as "Lito." The issue at trial was the severity of the homicide. The prosecution theorized, in part, that this was murder by lying in wait. The jury evidently accepted this theory, convicting Hernandez of first degree murder and finding true the lying-in-wait special circumstance, which made him subject to a sentence of life in prison without the possibility of parole.

Emphasizing the various versions of events presented at trial, Hernandez contests the sufficiency of the evidence of lying in wait. Viewing the record in the light most favorable to the judgment, as we must, we conclude there was substantial evidence to support the jury's finding. Hernandez also contends, and the Attorney General concedes, that the trial court erred in imposing sentence on an additional conviction for negligent discharge of a firearm. We agree with the parties. Accordingly, we affirm Hernandez's convictions but remand for full resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

The shooting in this case took place at an apartment complex on Avenue 44 in Indio.[1] There are two parking lots within the complex—a north lot and a south lot. The parking lots are connected by a driveway along the west side of the complex. The western border of the property is lined with a wrought iron fence and bougainvillea bushes. The only entrance and exit to the complex is located at the southwest corner, where the driveway meets Avenue 44.

---

[1] A map of the complex is attached to this opinion as Appendix A. The map was the People's exhibit No. 2 at trial. We have redacted the name and address of the complex. Certain symbols were added to the map during witness testimony at trial. These will be explained below.

2

At the time of the shooting, in April 2014, several members of the Hernandez family lived at this apartment complex, including Lito's mother and two sisters. Hernandez and his younger brother, J.H., lived about a mile away from the complex, about three minutes driving or 20 minutes walking. Hernandez was 18 years old and J.H. was 16. Lito was in his thirties.

On the night in question, Lito, Hernandez, and J.H. attended a party at a residence near the back of the complex, along with about a dozen other people including Luis S. and Ruben U. Luis had just met Lito the day prior. He met Hernandez and J.H. for the first time at the party.

According to Luis,[2] Hernandez and J.H. arrived around 10:00 or 10:30 p.m. They seemed intoxicated. Hernandez had an "attitude towards everyone" at the party. When he had a hard time getting a drink, he got into an argument and pushing match with another partygoer. Luis and Lito told him to calm down, but he refused. With Lito's permission, Luis led Hernandez to a grassy area at the back of the complex to talk. Luis told him he was being disrespectful. The conversation led to a brief physical fight, then Lito intervened. Luis returned to the party while Lito stayed behind with Hernandez and J.H. When Lito rejoined the gathering, he apologized to Luis and said he asked the brothers to leave. Luis saw them walking out of the complex.

About a half hour later, around midnight, Lito left the party. Moments later, Luis and Ruben also left to go buy more alcohol. They got into Ruben's truck, which was parked in the north parking lot of the complex, and reversed to the top of the driveway. Ruben stopped the truck for about five

---

[2]    At trial in 2022, Luis testified that he could not remember many details of the shooting, so his version of events was largely presented through his statements to police about five days after the shooting and his preliminary hearing testimony in June 2016.

seconds to make sure they had money for the alcohol. At this point, Luis noticed Lito walking south down the driveway. When Lito was about halfway down the driveway, near his own car, Ruben slowly started driving south. Luis saw two "youngsters"—Hernandez and J.H.—"just waiting" on the west corner of the entrance/exit to the complex. (See Appen. A [the rectangle with an "R" is where Ruben's truck was parked; they drove south per the arrow; the rectangle near Apartment 35 is where Lito's car was parked; the square on the southwest corner is where the brothers waited].)

While J.H. remained on the corner, Hernandez began "creeping up" on Lito. Hernandez initially walked slow, then took "much bigger" steps as he got closer. Lito reached the corner where the driveway connected with the south parking lot. He was faced away from Hernandez, looking towards the apartments. When Hernandez was about four feet away, he got Lito's attention, shot him, then ran away with J.H. Lito collapsed to the ground. (See Appen. A [the "x" near Apartment 35 is where Luis saw the shooting from; the circle near Apartment 39 is where Lito was shot].) Ruben and Luis left immediately. As they drove out of the complex, they heard multiple gunshots fired towards them.

Lito's mother returned home sometime after midnight. As she drove into the complex, she saw someone lying on the ground in the driveway. She stopped her car, approached the person, and realized it was her son. (See Appen. A [the rectangle in the south parking lot is where she stopped her car].) When Lito did not respond to her attempts to get him up, she put her head against his chest and realized that he was not breathing. She ran to her daughter's apartment, banged on the door, and urged her daughter to call 911.

4

Police arrived shortly thereafter and confirmed that Lito was dead. His body lay about 40 feet from the entrance/exit. A cartridge case was found about five feet to the southwest of his body. An autopsy later revealed the cause of death was a single gunshot wound to his right temple area. The entrance wound indicated that Lito was shot from at least two feet away. The bullet appeared to travel from the front toward the back of his head, in a slightly upward direction.

About six days after the shooting, the police interviewed Hernandez and J.H.[3] separately. Initially, J.H. said they went to the party around 9:00 p.m., drank a couple beers, then left around 10:30 p.m. He eventually admitted his brother got into a fight, but maintained they left right after that. Lito "wasn't even around" them. When the officers said they had a video showing him on the southwest corner of the property that night (a ruse), he said he vomited there.

Meanwhile, in another interview room, Hernandez said they arrived at the complex around 10:20 p.m. and parked his truck in the south parking lot. At the party, some guys were looking at him wrong, so they started arguing. The fight turned physical with one of the individuals, presumably Luis. Luis pushed him and "barely tackled" him. Lito came to his defense, telling Luis to "chill out" and pushing him away. He told Hernandez to go home. He did not want Hernandez to get into trouble, and J.H. had school in the morning. Hernandez agreed and left. He was upset that Lito interrupted the fight, but respected Lito and listened to him. The brothers left around 10:30 p.m. Hernandez claimed this was the last time he saw Lito.

---

[3] At trial, J.H. claimed he could not really recall the night of shooting because he was drinking that night and a long time had passed, so his statements to police were presented to the jury.

5

When they were alone together in the interview room, Hernandez asked J.H. what the officers knew.  When J.H. mentioned the supposed video, Hernandez said they would discuss it at home.

The police interviewed the brothers again the next day.  On this date, J.H. admitted he saw Lito at the party.  After the fight, as the brothers walked back to their truck, Hernandez said, " 'Fuck that fool.' "  Hernandez was angry because Lito scolded him and told him to calm down.  Initially, J.H. said Hernandez grabbed a .22 caliber rifle from the truck and told him: " 'Wait in the truck.  I have to go do something real quick.' "  When Hernandez returned to the truck about 10 to 15 minutes later, he said that "he can't trust anyone, especially family."  J.H. thought he was referring to Lito.

Later in the interview, however, J.H. said they grabbed the rifle from the truck and then walked to the southwest corner of the property, where the driveway met Avenue 44.  The brothers walked for two or three minutes.  J.H. agreed that they were silently "hunting" for Lito so Hernandez could shoot him.  They were on the corner for about one minute, then they heard Lito's voice and saw him walking.

They did not approach Lito or get his attention right away.  They "stayed where [they] were."  Then, Hernandez ran up to Lito and shot him from about seven feet away, as Lito was turned sideways.  J.H. stayed on the corner and looked away.  He did not think Lito saw them.  Right after the shooting, J.H. saw a truck drive from the north parking lot out of the complex.  Hernandez shot at the truck twice.  J.H. initially stated they ran home but later said they drove home in their truck.

At the same time, Hernandez decided to tell the officers "what really happened."  At first, he said he dropped J.H. off at home then walked back

6

to the apartments to finish the fight. He brought his rifle so Lito could back him up. As he entered the complex, Lito was "right there" near the entrance. Lito seemed furious and asked what he was doing there. Hernandez was about to tell him he came back to "squash the beef with these guys" when Lito grabbed the rifle and it fired accidentally. Hernandez ran away immediately. He insisted that J.H. was not with him. He then guided the officers to a wash where he had hid the rifle.

When they got back to the station, the lead detective told Hernandez that his story was inconsistent with the gunshot wound and with J.H.'s story. Hernandez maintained that J.H. was not there, but he admitted the shooting was not an accident. This time, he said he went back to the apartments to finish the fight, but then he encountered Lito, who was "mouthing off" and saying "all kinds of stupid shit." Lito said: " 'What the hell are you doing here? I told you guys to get the hell out of here.' " Angry, he started walking towards Hernandez fast. Hernandez thought: " 'Oh, my God. He's gonna try something.' " He pulled the rifle out, Lito tried to smack it away, then Hernandez took a step back and pulled the trigger. When asked what kind of guy Lito was, Hernandez said that he was "pretty cool" but "[y]ou couldn't trust him."

Eventually, Hernandez said J.H. followed him when he walked back to the complex. Hernandez told J.H. to go home, but he refused. Hernandez did not want him to walk back home alone in the dark, so he told J.H. to hurry up and join him. J.H. stayed on the corner of the entrance/exit when the shooting happened. He denied telling J.H. he was going to shoot Lito because that was not his plan. He went there to deal with Luis. He had no problem with Lito, who was at the wrong place at the wrong time.

His final story was that he went home to get his rifle, then drove his truck back to the complex. Again, he tried to tell J.H. to stay home but J.H. refused. Hernandez told J.H. if he insisted on coming, he had to stay in the truck. But when they got to the complex, J.H. got out of the truck to vomit on the corner of the entrance/exit. J.H. remained there during the shooting. He admitted he shot once into the air when Luis and Ruben drove by. He drove J.H. home, then went to hide the rifle in the wash.

Almost two years later, in February 2016, J.H. sat down with the lead detective, a deputy district attorney, and an investigator. On this date, J.H. said that Lito told them to leave after the fight. They drove home, then walked back to the complex with the rifle. Hernandez was angry at Lito because he was "always ripping people off" and "confronting [Hernandez] about stuff." When they got to the complex, J.H. stayed on the corner while Hernandez continued walking into the complex. Hernandez was looking for Lito. He wanted to scare him by shooting at him or near him. When J.H. refused to say more, the interview was terminated.

The prosecution charged Hernandez with the murder of Lito (Pen. Code, § 187, subd. (a); count 1),[4] the attempted premeditated murder of Luis and Ruben (§§ 664/187, subd. (a); counts 2 and 3), and discharging a firearm at an occupied motor vehicle (§ 246; count 4). As to the murder, the prosecution alleged the special circumstance that Hernandez intentionally killed Lito while lying in wait (§ 190.2, subd. (a)(15)) and that he personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)). Regarding the attempted murders, the prosecution

---

[4] Further undesignated statutory references are to the Penal Code.

asserted that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).[5]

A jury convicted Hernandez of first degree murder and found true the lying-in-wait special circumstance and the firearm enhancement (count 1). The jury acquitted him of both attempted murders (counts 2 and 3). It also acquitted him of shooting at an occupied motor vehicle, but convicted him of the lesser included offense of shooting a firearm in a grossly negligent manner (§ 246.3; count 4). The court sentenced him to life in prison without the possibility of parole for the special circumstance murder, plus 25 years to life for the firearm enhancement. It imposed a consecutive term of five years for the negligent discharge of a firearm.[6]

## DISCUSSION

Hernandez's primary contention is that there was insufficient evidence to support a finding that he committed the murder of Lito by lying in wait. He also asserts the trial court imposed an unauthorized five-year prison term on count 4 involving the negligent discharge of a firearm. We reject his first argument, but accept the second, requiring that we remand for resentencing.

**A.    *There is substantial evidence of lying in wait.***

Hernandez contends there was insufficient evidence of lying in wait. Specifically, he asserts there was no evidence of a substantial period of watching and waiting. The upshot of his argument is twofold: (1) the true

---

[5]    As J.H. was only 16 years old at the time of the murder, his case was adjudicated separately in the juvenile court.

[6]    The prosecution alleged several circumstances in aggravation under California Rules of Court, rule 4.421, but none were admitted or found true before sentencing. As a result, the court was limited to selecting the midterm or low term on count 4. (See § 1170, subd. (b).)

finding on the lying-in-wait special circumstance is unsupported; and (2) the court prejudicially erred in instructing the jury on lying in wait as a theory of first degree murder. We reject his claim at its premise.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 (*Kraft*); see also *People v. Mataele* (2022) 13 Cal.5th 372, 420 [the same standard applies to assess the sufficiency of the evidence supporting a special circumstance finding].)

Under this standard, "[t]he appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Kraft*, *supra*, 23 Cal.4th at p. 1053.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id.* at p. 1054.) Reversal is unwarranted "unless it appears 'that upon no hypothesis whatsoever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Further, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2004) 34 Cal.4th 1149, 1181 (*Young*), citations omitted.)

10

The lying-in-wait special circumstance "requires an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . ." (*People v. Johnson* (2016) 62 Cal.4th 600, 629 (*Johnson*), internal quotations omitted.) Murder by lying in wait "historically has been considered more reprehensible than other murders" because the victim is denied "any chance of escape, aid, or self-defense." (*Id.* at p. 637.)[7]

The purpose of the "watching and waiting" requirement " 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073 (*Mendoza*), internal citations omitted.) A few minutes, or even 90 seconds, can suffice. (*People v. Moon* (2005) 37 Cal.4th 1, 23 (*Moon*).) Also, " '[w]atchful' does not require actual watching; it can include being 'alert and vigilant' in anticipation of the victim's arrival to take him or her by surprise." (*People v. Streeter* (2012) 54 Cal.4th 205, 247.) This element is the same for first degree murder and for the special circumstance. (*People v. Stevens* (2007) 41 Cal.4th 182, 202, fn. 11.)

---

7    In this case, the prosecution alleged that Hernandez intentionally killed Lito "while" lying in wait. In 2000, the electorate amended the special circumstance (§ 190.2, subd. (a)(15)) to require the killing be committed "by means of" lying in wait instead of "while" lying in wait, "to conform the temporal connection between the killing and the lying in wait required for the special circumstance to that required for lying-in-wait first degree murder." (*Johnson, supra*, 62 Cal.4th at p. 635.) This amendment did not alter the "watching and waiting" element. (See *id.* at pp. 629–630.) Hernandez does not raise any issue concerning the outdated, more stringent language.

11

Viewing the record in the light most favorable to the verdict, a rational jury could have found a substantial period of watching and waiting based on statements from Luis and J.H. According to one version of events described by J.H., they walked for two or three minutes around the southwest portion of the complex "hunting" for Lito so that Hernandez could shoot him. They stopped on the west corner of the entrance/exit for about one minute. Significantly, this is the only exit from the complex. It is also near the bougainvillea bushes lining the west side of the complex. From the evidence that Hernandez chose to wait in this obscure spot—as opposed to looking for Lito throughout the whole complex—the jury could have fairly inferred that Hernandez planned to catch Lito on his way to his car or exiting the complex after the party, and to ambush Lito before Lito saw him. This way, he could launch his attack at the moment and in the manner most likely to achieve his lethal goal.

Indeed, when the brothers spotted Lito in the driveway, they did not immediately approach him, call out to him, or otherwise seek to draw his attention. They initially "stayed where [they] were." The jury could have found this was when Luis first saw the brothers "just waiting" on the west corner. Continuing with Luis's version of events, Hernandez began "creeping up" on Lito. He moved slowly with his head down. As he got closer, he quickened his pace. All the while, Lito was turned away from him. If Lito saw Hernandez at all—J.H. did not think he did—it was at the last moment, too late for "escape, aid, or self-defense." (*Johnson*, *supra*, 62 Cal.4th at p. 637.) The jury could have fairly concluded that waiting a moment on the corner, then slowly sneaking up on Lito, was part of Hernandez's watching and waiting for an opportune time to act—i.e., when Lito was close enough

12

to shoot but still facing another direction, so he would not see Hernandez approaching him with the loaded rifle.

To be sure, the record indicates the period of watching and waiting—from the two or three minutes of walking around the southwest area of the property, to the minute on the corner, to the creeping approach—was something less than five minutes at most. But the Supreme Court has made it clear that the precise period of time is not critical; as little as 90 seconds can be enough. (*Moon*, *supra*, 37 Cal.5th at p. 23.) The crucial inquiry is whether the attack was insidious as opposed to impulsive. (*Mendoza*, *supra*, 52 Cal.4th at p. 1073.) Given the evidence that Hernandez waited with his rifle near the only exit to the complex, continued to wait when he spotted Lito walking down the driveway, crept up on him as he looked away, and then shot him in the side of his head once he was close enough to ensure he did not miss, the jury was justified in believing the shooting was considered and insidious, not the result of rash impulse.

Hernandez compares his case to *People v. Nelson* (2016) 1 Cal.5th 513 (*Nelson*) and *People v. Carter* (2005) 36 Cal.4th 1215 (*Carter*), but both are distinguishable. The defendant in *Nelson* failed to receive a promotion. He knew that his coworker, who received the promotion instead, waited in the parking lot before work. Early in the morning, the defendant rode his bicycle to the parking lot with a loaded gun. He "parked his bicycle, approached the car on foot from behind and fired several shots into the car through an open rear window, then started to walk away before returning and firing again into the car." (*Nelson*, at p. 522.) The coworker and her friend, who was also in the car, died of multiple gunshot wounds. (*Id*. at p. 525.) The Supreme Court reversed a lying-in-wait finding because there was no evidence of a "distinct period of watchful waiting." (*Id*. at pp. 521, 551.) As there was no

13

evidence that the defendant "arrived before the victims or waited in ambush for their arrival" there was no factual basis to infer that he waited for a time when the victims would be vulnerable to surprise attack. (*Id.* at p. 551.)

Essentially, the only version of events presented to the jury in *Nelson* was that the defendant found the victims, then immediately approached them and shot them. Hernandez gave a story that was somewhat akin to *Nelson*. At one point, he said that he arrived at the complex and immediately found Lito near the entrance. Lito seemed furious that Hernandez came back after he told him to leave. They approached each other, or Lito marched towards him, then Hernandez fired the rifle accidentally or impulsively. But the jurors were not required to accept this version of events. Instead, they were free to rely on evidence from J.H. and Luis that Hernandez waited on the corner in the dark by the bushes and, once Lito was close but looking away, crept up on him and shot him. This evidence of waiting and creeping sets this case apart from *Nelson*.

In *Carter*, the defendant fatally strangled the victim in her home. (36 Cal.4th at p. 1260.) There was some evidence of forced entry, in the form of a pried doorjamb and wood chips by the victim's front door. (*Id.* at pp. 1231–1232, 1260.) A neighbor also observed the defendant's car idling in front of the victim's house around the time she was killed. (*Id.* at pp. 1230, 1260.) The Supreme Court held this evidence was insufficient to establish lying in wait. (*Id.* at p. 1261.) As the court reasoned, the wood chips tended to show forced entry, but not when entry occurred. (*Ibid.*) The defendant could have forced entry while the victim was distracted in another part of her home. (*Id.* at p. 1262.) And the timing of when the neighbor saw the car idling could not be pinpointed. (*Ibid.*) As a result, the evidence failed to support an inference that the defendant waited in her home or in his car until

14

she returned, to facilitate a surprise attack. (*Id.* at pp. 1261–1262.) Here, in contrast, there was evidence that Hernandez hunted near the entrance/exit and waited on the corner *before* he found and shot Lito.

Hernandez emphasizes that J.H. gave various inconsistent statements to police. That may be true, but it does not mean the jury was required to disbelieve everything J.H. said. To the contrary, the trial court instructed the jury to "not automatically reject testimony just because of inconsistencies or conflicts." Instead, the jurors were empowered to "believe all, part, or none of any witness's testimony" depending on their evaluation of the witness. (CALCRIM No. 226.) Hernandez fails to demonstrate how J.H.'s statements to police relevant to watching and waiting were physically impossible or inherently improbable, such that we must disregard them in assessing the sufficiency of the evidence on appeal. (See *Young*, *supra*, 34 Cal.4th at p. 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"]; see also *In re S.A.* (2010) 182 Cal.App.4th 1128, 1149 ["inconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court"].) In sum, the jury could have reasonably relied on certain portions of J.H.'s statements, in combination with Luis's statements, to find that Hernandez watched and waited for an opportune time to shoot Lito.

## B. *The five-year sentence on count 4 is unauthorized.*

Hernandez contends, and the Attorney General concedes, that the trial court erred in imposing five years on count 4 because that is not an option under the sentencing triad for this offense. We agree with the parties that the five-year term is unauthorized.

15

On count 4, the jury found Hernandez not guilty of shooting at an occupied motor vehicle (§ 246) but guilty of the lesser included offense of negligent discharge of a firearm (§ 246.3). The jury also found true that the offense was a serious felony within the meaning of section 1192.7, subdivision (c)(8). At sentencing, the trial court purported to impose the midterm of five years on that count. It seems the court mistakenly referenced the triad for shooting at an occupied vehicle instead of negligent discharge of a firearm. The latter offense permits a sentence of 16 months, two years, or three years in prison. (§§ 246.3, subd. (a), 1170, subd. (h).) Accordingly, we must remand for the trial court to select an authorized term on count 4. (See *People v. Massengale* (1970) 10 Cal.App.3d 689, 693 ["When a court pronounces a sentence which is unauthorized by the Penal Code, that sentence must be vacated and a proper sentence imposed whenever the mistake is appropriately brought to the attention of the court"].)

The parties disagree on whether the trial court on remand should conduct a full resentencing or simply correct the unauthorized term. "The general rule is that on remand for resentencing the trial court is '[n]ot limited to merely [correcting] illegal portions' and 'may reconsider all sentencing choices. [Citations.] This rule is justified because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components. The invalidity of one component infects the entire scheme.' " (*People v. Codinha* (2023) 92 Cal.App.5th 976, 994.) In this situation, the court "may consider 'any pertinent circumstances which have arisen since the prior sentence was imposed.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) As the Attorney General offers no analysis explaining

16

why we should depart from this general rule, we will remand for a full resentencing hearing.[8]

## DISPOSITION

The matter is remanded for resentencing consistent with this opinion. Upon resentencing, the superior court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.[9]

DATO, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.

[8]    As a practical matter, we recognize that because the trial court must impose life without parole for the special circumstance murder (see § 1385.1), the only other aspect of Hernandez's sentence that could possibly be adjusted is the firearm enhancement (see, e.g., *People v. McDavid* (2024) 15 Cal.5th 1015, 1030 [§ 12022.53, subd. (h) gives courts discretion to strike enhancements under that section or impose a lesser included, uncharged enhancement]).  We express no opinion on whether or how the court should exercise its discretion.

[9]    On December 22, 2023, the Attorney General filed a motion to strike its initial responsive brief and replace it with a proposed revised responsive brief that corrects certain citations to the record.  We grant the Attorney General's motion, strike its initial responsive brief filed on December 12, 2023, and deem its revised responsive brief filed as of December 22, 2023.



**APPENDIX A**

46

18